United States v. Chen and I guess Mr. Greenberg, come forward and whenever you're ready, we'll hear from you. Your Honor, I'm ready to proceed. May it please the Court. My name is Kerry Greenberg on behalf of Mr. Chen. Your Honor, as you know, we're seeking in our brief that the Court reverse the convictions against Mr. Chen and dismiss the case. We have other issues we've raised as well that in the event that that were not to occur, that certain pieces of it should be carved away. We have a forfeiture issue. We have issues about the jury instructions. If I could, I'd like to give the Court just a brief of the backgrounds of the factual circumstances. As you know, this case involves the buying and selling of gift cards. And he was charged with access device fraud. The gift cards that Mr. Chen started buying and selling was he went onto the net. I know they call it the dark net, but he was on the net and he bought things from a place called T-Bow and from eBay. And he found that he could buy gift cards primarily from Walmart, but other places as well, at a discount. And then he could go and he could redeem those cards for face value and then he could make money on it. These are stolen cards? The ones that were determined to be stolen or through the course of fraud, yes. I mean, I don't know that all of them were. That wasn't actually something that was proven, but there was proof that there was some that were. So I think that that satisfied the first prong, I would suggest, of the argument, which is that they were obtained in a way that made them unauthorized. So the first thing is you have to obtain them. It's sort of a black market. I don't know that it's a black market. Well, if you're dealing in stolen cards and some of those cards are stolen and sort of known, he buys those cards at risk. And the whole way he handled them thereafter with speed and was in order to cash in on the stolen cards before the issuers or the owners were able to forestall those transactions. Your Honor, I'm going to just ask that you consider tweaking that just a little bit to the following. I think that the reason, because as you said, it was in a black market. Can you just keep your voice up? Absolutely, sir. To the degree that it was in a black market, if he buys something, what happens, of course, as you know, they take the gift card, they peel off the secret number and the PIN number, and they can send that and use that. You never actually need to have the receipt of the card. Now, if you are on a site, they could sell that exact card number four or five times in a row, and it would be a race to whoever was going to be the one that gets it because you're not getting it from a trusted seller. So one of the reasons to do it fast, quite frankly, would be just to make sure that you were the one that got the money that you just bought for the card. It's not necessarily because it has anything to do with the purchaser. Gift cards, generally speaking, are not actually owned by the owner of the gift card. They are, by definition, gift cards. So what happens is somebody buys the gift cards and then gives them away. You're never going to normally, because they don't take a registration number, they don't take any personal identifiers, if I buy gift cards for my grandchildren or for my friends or for my employees and I give it to them. Well, what's your point in this case? You're saying he didn't commit wire fraud. Well, it wasn't wire fraud. He was in charge with that, Your Honor. Access device fraud. He did not commit access device fraud for this reason, because the way Congress set it up is first you have to obtain it. And you obtain these cards. They become unauthorized if they were lost, stolen, they expired, or if they're obtained by fraud. And then when you obtain these, you have to then intend to defraud someone else. When he took the gift cards that he received, that he bought, that he bought from a seller. I'm sorry. Can you just tell me where the someone else comes from? It's unclear. That seems like it's a problem for your argument. Well, Your Honor, I would submit that it's not for this reason. If you go onto eBay, and you can today buy gift cards all day long that are discounts. I mean, they're both legitimate and not. If you just buy and sell them, that's not a problem for him. If it turns out that they were unauthorized, that might be a problem for him for trafficking, if he traffics and uses them with the intent to defraud. But the way they initially were obtained. I thought you agreed in this case he was using some stolen cards. I said that the evidence would support that, and I don't dispute that some of the cards were stolen and therefore unauthorized. But your argument, as I understand it, is, yeah, he's using stolen cards. He steals things. He's a thief, but he's not a fraudster because he didn't intend to defraud, because he didn't interact with any victims. No. Something like that? Well, no. If I could say it. Well, then, okay. I was trying to help you. Maybe incorrect. No. Maybe I shouldn't try to help you. No, please do help me, Judge Thacker. I can tell you're going to do a better job than I am. He did not have an intent to defraud is what I'm understanding your argument to be. That's correct. So now maybe you could explain, perhaps better than I did, why he didn't have an intent to defraud under the statute with which he was charged. There were hundreds of gift cards. The government found three or four people over a two-year span that unfortunately in today's world there's lots of fraud and that these people were contacted by somebody, it was never known who, that made up stories and for various and sundry reasons got them to go down to Walmart. And the government didn't charge him with doing that. It wasn't him that did that. They didn't charge him with that. That's right. And there was no statement that he knew those people or he was part of those people or he was part of that fraud. So now the question is he gets these unauthorized cards because perhaps they're stolen but not from fraud necessarily. And then the question is... If they're stolen, they're depriving the owner of the card of that money if they're stolen. And he is taking those cards and cashing in on the money that the owner had, the unknown owners, the victims, and taking that money and using it for his own purposes. But, Your Honor, he's two levels down the road from that. But I don't... And can I say one thing? I'm sorry, Your Honor, I don't want to interrupt you but... Well, but you did interrupt her. You said you didn't want to but you did. I think maybe you should let Judge Harris ask her question. Here's my question. It's about the difference between a conduct element and an intent element because I do understand your argument that this guy was not sort of a front line scammer. He was not telling the lies. He would not meet that conduct element but I don't understand why it's not enough. Just assume for a minute. I think a jury, based on the evidence presented, could find that he knew that these cards were obtained by fraud, that he rushed in to redeem the codes before they could be shut down. Why couldn't a jury find from that that he intended the result of his actions, which would be that the original owners were defrauded? Because, Your Honor, if that were the case, then it would be superfluous to say obtain it with intent to defraud. The answer would simply be that Congress would say that if you traffic and use unauthorized access devices, by definition, you're guilty. But they didn't. They asked for something else. And the activity, as you point out, the activity that's necessary, the verb of defrauding, it requires Mr. Chen to do some act that causes fraud. He did. He tried to launder, knowing they were assuming that he knew they were fraud, stolen, and he tried to launder them to ultimately convert them into clean cards or to obtain merchandise, and he got a slice of that. The whole scheme was to launder the fraudulent money obtained from the cardholders, and he very well knew that the only way to do that is to do it quickly before it was being uncovered. And he obtained the proceeds from the owner, knowing it was stolen money. Judge Neumeier. Isn't that what happened, alleged? No, Your Honor, because I think there are different statutes, right? There's money laundering, as you just indicated. No, no. Access fraud. Access fraud. Access fraud requires something significantly different. Access fraud requires that when he uses the card, with the intent he obtains it, with the intent to defraud a third party. Your Honor, you know that they can be unauthorized access devices if you find them on the street, if they're lost, if they're stolen, if they're expired. Those are hypotheticals. The case here is that a jury could find he knew this was stolen property, and he was trying to cash in on stolen property by manipulating the cash-in basis to obtain clean cards. Your Honor, let me ask you this. Let me just suggest this. If they were stolen, let's assume somebody goes and steals 10 cards. Don't you think there's sufficient evidence for a jury to conclude that? Yes. Yes, I do. Okay. All of that, but your point is not the intent to defraud parties. Exactly. Exactly. Exactly. So it could be either through fraud or just through stolen. If it's stolen, there is no fraud at all involved. It still is an unauthorized gift card, but then the question is he has to take that gift card and then use it. He has to obtain it with the intent to defraud, and then he has to actually, as we know, through fraud, he has to both deceive and cheat somebody afterward. Walmart, where he redeemed the card. No, he cheats the original owner. He knows it's not his property. He knows it belongs to somebody else, and he tries to take it and convert it to his own property in violation of the original owner's money. But not through fraud, Your Honor.  If it's just a theft, Your Honor, what I'm saying is— It's all deceitful. The whole intent was to take that money away. Your Honor, the Congress used two different words. They said if you obtain it by fraud, the unauthorized card, or by theft, they distinguish between— What do you think he intended this whole scheme was to do? The whole scheme had intent, was filled with intent. He had a very clever scheme as to have his runners go and cash it in quickly and give him the money and then buy clean cards, which he sold. And the question is that was all done intentionally, and it was all done with the idea of depriving the original owners of their legitimate money. Your Honor— He did not participate in the original theft. He did not. But that doesn't save him. It should, though. It should because if they wanted to charge him with buying and selling stolen property, that would have been a different offense. It's not a question of whether the conduct could otherwise be illegal. Whether he committed fraud with his access to the money. That's the question, Your Honor. Yes, that's the question. And the government, I would submit to the court, actually expanded the nature of the conspiracy inappropriately in order to try to find that. And they did it in two ways. Number one, they tried to link in these initial fraudulent purchases, if you will, or theft. But the people that testified. And they also wanted to link in Andrew Feldman, which was a one-off—I don't have much time now—with regard to the credit card. The one credit card that had nothing to do with the gift cards, that wasn't part of any of the people that were involved in this in any way, shape, or form. But there was one standalone credit card that he ended up getting and tried to use for $600. And that happened after all the people that were in the conspiracy pled and were cooperating with the government. And they tried to expand the entire universe of that to his prejudice so they could try to bring in this other fraud that he was not part of. Your Honor, as I said, it's not a question of whether you condone the conduct and there might be other ways to prosecute him. This was the third or fourth superseding indictment. And the reason they had to keep trying to figure it out is because they weren't sure how to charge this. But I'm submitting to you that they got this wrong. That they don't—ultimately, they didn't prove what they need to prove. It's not enough to go back and say that because you used the card that somehow he facilitated the initial fraud. That's not the case. And I think that that matters. I know I have a little bit of time to rebut, but.  Thank you. Thank you. All right. Mr. Ray. Good morning, Your Honors. Zachary Ray for the United States, and may it please the Court. I'll begin where my friend on the other side left off, which was the structure of the conspiracy. I think it's important for the Court to understand just how this works. One, there was a source of unauthorized access devices. These were the stolen gift and debit cards that were stolen from the individual victims here. Second, there was a supplier of these unauthorized access devices. These were people like trace— And when you say they were stolen, right at the very beginning, that's where the fraud was. They were stolen through deceit, correct? That's correct, Your Honor. And that's the two steps removed from appellant here. But you were—so we start there, and then what do they do with the ones, the gift cards they got through deceit? Sure. So after the gift cards are obtained through deceit, someone like Tracy traffics those access devices in the form of profiles to people like Mr. Chin. Right. So that's the second layer, also not appellant here. And so did that second level of the scheme involve deceit or fraud? It does involve fraud because it involves the transfer— Because you're relating back to the first layer? That's correct, Your Honor. It does involve fraud because what people like Tracy are doing is they are trafficking those already unauthorized access devices. And to be clear, Tracy is not the appellant here. We still haven't gotten to what appellant has done that indicates any intent to defraud. That's correct, Judge Thacker, and I'll get to that. So the testimony that the jury heard from Tracy, who was a supplier, was that he communicated with Mr. Chin that he got Walmart accounts from hacking. Tracy testified that hacking means to get someone else's credentials without their authority. He said that he gets the accounts from the dark web. He said typically only illegal things are bought and sold on the dark web, and he goes so far as to say it had to have been illegal. This is testimony that the jury heard. It was clear from Tracy's testimony that Mr. Chin understood at the point that those accounts were transferred and sent and exchanged between Tracy and Mr. Chin that they were from unauthorized sources, that they were stolen from the true owners. The next step in the conspiracy was for Mr. . . . Were there substantive access device charges separate from the conspiracy? Yes, Judge. Okay. So count one . . . So your conspiracy, I think I understand where you're going with your conspiracy, that all of that, everything they all did together, and that testimony indicates that appellant was a part of that conspiracy. But what about the substantive stand-alone counts against appellant? What evidence, other than relating back to the conspiracy, is there that he intended to defraud? Sure, Judge. So I'll begin with the fact that the appellant knew from the time that he received those ZIP cards that they were unauthorized and that they belonged to the other people. So to the extent that, Judge, you are asking about whether there's sufficient evidence that the jury heard to convict of the access device fraud, there is, and here's why. We understand from the runners that Mr. Chin instructed them how and when to redeem these gift cards. Anyone that knows how gift cards work knows that the way that Mr. Chin instructed the runners to redeem the cards was not above board. This is what he told them to do. He said, go in and be very, very fast. We heard from runners, the jury heard from runners like Jin Hong. Jin Hong's job was to sit outside of Wal-Mart stores and wait for Mr. Chin to send him a gift card redemption code and a pen. Immediately after that, Jin Hong went into the Wal-Mart because he knew that if he waited too long, the value of that card would disappear. Mr. Hong testified that often the value did disappear, and those were in cases where either someone else purchased the card or the true owner realized that there was a fraud and got their money back. So if I could make sure I understand what you're saying in response to what evidence there is that he knew that the – well, what evidence there is that he had an intent to defraud. It is, first of all, the testimony of Mr. Tracy that he told appellant all of what had happened before in steps one and two and that they were obtained by fraud. And then based on that, because of the way that then appellant conducted his criminal activity in terms of do this quickly, all of that stuff, the jury could infer that he had an intent to defraud or that there was an intent to defraud? I think that's close to what I'm saying. Maybe I can put a finer point on it. So for intent to defraud, the government had to prove that Mr. Chin acted with a purpose to deceive and cheat. I think the government proved that – And not have the cheat – well, go ahead. I think the government proved that Mr. Chin had the purpose to deceive and cheat with respect to trafficking access devices and using access devices. I would think when he goes in at a very quick pace into the Walmart knowing it's stolen and trying to get money from Walmart based on stolen, he's attempting to defraud Walmart. Walmart, if it knew the facts, would not have given him that money. I think that's right, Judge Niemeyer. And so not only is there the initial fraud from the owner of the gift card, which he didn't participate in but knew about, he then took the card and quickly presented it to Walmart knowing that if he waited longer, he wouldn't get the money, and Walmart wouldn't give it to him. So he was deceiving Walmart by that manipulation. That's correct, Judge Niemeyer. And even if we go a step further, the jury heard information from some of the runners that Mr. Chin instructed them to go a step further, which was to actually lie to Walmart if one of the cashiers or one of the customer service representatives came up to them. And that was to say that they bought the cards from someone – And whose – which testimony do I look to for that? Your Honor, I believe it is Jen Hung and Mulan Wu. I believe both of them told the jury that if and when they were caught, Mr. Chin told them to lie to deceive Walmart about the purpose of their transactions and about the origins of the cards. I think that also shows an intent to deceive and cheat. With respect to use, I think it's a bit more clear, and I think the example from Andrea Feldman is probably the easiest one for most people to wrap their heads around. So with respect to Andrea Feldman, Mr. Chin asked for her debit card information explicitly because he wanted to buy goods that were outside of the Walmart universe. When he did that, he both lied and cheated. He lied to Costco impersonating Andrea Feldman in order to deceive and cheat Andrea Feldman out of her own money. So in that sense, we have proven the – That is the aggravated identity theft. But it also goes to the – It goes to fraud too. Yes, Judge. What evidence is there that he used any of the money that was wired to him to continue funding the gift card scheme based on the two dates charged in the indictment? Sure, Judge. I'll start with the rule here, which is evidence that a defendant was engaged in – Well, I'll start with what's been said in the Stewart case in 2001. Evidence that a defendant engaged in drug trafficking – here it's access device trafficking – and had insufficient legitimate income to produce the money used in a transaction is sufficient to establish that the money – Sure. And can instead rely on that as circumstantial evidence. Yes. But in this case, the government, for whatever reason, did come in and show what happened to the money, and the answer is the money stayed in his bank account. So I don't see how when you have direct evidence that the money stayed in his bank account or was used for normal life expenses, you can turn around and then say, well, forget the direct evidence. We'd like you to rely on this inference that we use when there is no direct evidence. I think, Judge Harris, there are two issues with that view. I think one of the assumptions that's being made is that the government had access to all of Mr. Chin's bank accounts and all of his finances, and I don't know that to be the case. What we know is the government had the burden of proof, and I didn't still hear an answer to my question, which is, what was the evidence at trial that appellant continued funding the gift card scheme with the money that was wired to him based on the two dates charged in the indictment? Sure. Special Agent Jang testified that the defendant, between the years of 2015 and 2021, had only $90,000 in legitimate income. So we start there. No, no. So that tells me that, as you said, there must be some other, like maybe there are some other bank accounts where he's getting this money from China and plowing it back in. But we know what happened to the money charged in Count 6 and Count 7. We know from the bank records that the government introduced that money did not go back into the scheme. I don't know how you get around the fact that I'm looking at my reproduction, and it just says where the money went, and the answer is it stayed in the account or it went to a debit card purchase or to Costco or monthly bills. Here's what we know, Judge. Again, I'll reemphasize that we know that there was not sufficient income in the account. That's why I think your conspiracy money laundering charge is probably fine, because probably you can rely on that inference as to sort of the money writ large. But these two counts are about very specific amounts of money that were received on very specific days. And as to those two amounts of money, if I am looking at this account activity following transfer evidence, how could a reasonable jury looking at that say, no, actually this money went somewhere else? Here's what we know from some of the runners about how they were paid. Again, we start from the position that there was illegitimate, that there was insufficient income in the account to begin with. We also know from runners like Jin Hong that they received a percentage of the money that they redeemed. So this is 3% to 5% of how much money they were redeeming at the Walmarts. We know that in particular, Jin Hong redeemed over $1.1 million. And that he stayed at Walmart and his payment was essentially to keep him there. That money had to come from somewhere. On these facts, I think a reasonable juror could conclude that the money from the scheme went to pay runners just like Jin Hong. Yes, the money from the scheme, but not the money from the $68,000 transfer that was received on March 3rd. And not the money from the $17,000 transfer that was received on January 29th. Because we know where that money went. And the answer is it did not go to the runners. I don't want to harangue you. I'm just not hearing how I get around as to those two specific transfers. We know where the money went. I think the disconnect, Judge Harris, is I think there's... I think I'm making an inference and I think a jury could make an inference that the money had to recycle, even in those two transactions. And I think you're looking at the one... Your Honor is looking at the one bank account and seeing a lack of movement. And that is concerning to the judge. But I think based on the sufficiency test, I think there's an inference that the jury could make. Just because you think the jury could infer that after it went into a parking meter, it somehow left the parking meter and went to the runner? Like this particular fund? No, Judge. But again, I'll remind the court. I'll remind the court that line-by-line tracing is not required. I know. But once you offer it up, that doesn't... I'm sorry. I don't want to take up all your time. No, I understand the court's concern. I don't know... I'm not aware of a Fourth Circuit case that requires that level of line-by-line tracing. I'm also not aware of a Fourth Circuit case that penalizes the government for producing it in situations where there is a reasonable inference that the jury can make. Well, the inference would be drawn from the modus operandi that was generally applicable to all transactions. That's correct, Judge Niemeyer. With my remaining time, I will address briefly the jury instructions. My friend on the other side complains of three different jury instructions. What he fails to do is accept that the Invited Error Doctrine bars the review of all of those jury instructions. Mr. Chin seems to conceive that all of the jury instructions in this case were jointly proposed by both the government and Mr. Chin's trial attorney. Recognizing that Invited Error is a high bar, Mr. Chin tries to skirt the issue altogether. He first tries to argue that there should be some type of exception to the Invited Error Doctrine. That is wrong. The only Fourth Circuit case that I could find from Mr. Chin's brief in which the Fourth Circuit created or recognized an exception to the Invited Error Doctrine is a 2025 case, United States v. NAM, N-A-U-M. In that case, the Fourth Circuit recognized and declined to apply the Invited Error Doctrine because there was an intervening change in the law while that case was on appeal. That intervening change in the law was the Ruan case, and it was a doctor kickback case. Here, those factors simply aren't met. The Dubin decision here was decided three months before the trial. Therefore, there's no reason to decline the Invited Error Doctrine. The next thing Mr. Chin does is also unsuccessful. He tries to cite out-of-circuit precedent, which is simply incompatible with the Fourth Circuit's jurisprudence for invited error. For example, Mr. Chin relies on a Ninth Circuit case, United States v. Perez, to suggest that this court should proceed to plain error review on the jury instructions instead of invited error. Can I ask you, just on this Dubin point, you're sort of arguing that we should not apply Dubin, but I would have thought that even if we did apply Dubin, your argument would be that the fraud is the crux of the offense, that when he takes AF's information and tries to use it to buy tires, that that is the crux of the offense, and that you wouldn't have a problem even under Dubin. Or are you arguing Dubin doesn't apply, and good thing, because we could not defend this conviction under Dubin? Sure, Judge, I'll clarify. What I'm arguing is there are sort of two species of Dubin arguments I think Mr. Chin makes. One is with the jury instructions. On the jury instruction issue, my argument is that the court need not even look at that. On the sufficiency of the evidence for whether or not aggravated identity theft is at the crux of the predicate felony, the evidence that the jury heard is sufficient to sustain that conviction. So to Your Honor's question, I'm not- I mean, they are related. If you're right about the invited error, then the only question we would ask is whether a jury could have found the aggravated identity theft as the jury was charged, and it wasn't charged that it has to be the crux, so we wouldn't even ask that question. That's right. I'm sorry if I'm misunderstanding. It doesn't matter. Can I ask you a question about the forfeiture order? Yes, Your Honor. So when the sentence is pronounced in September at the sentencing hearing, and he's sentenced to 84 months in prison, there's no forfeiture order, and the amount of the forfeiture hasn't been set. So the sentencing is over, but he doesn't know what his sentence is, at least the full extent of it. That does seem sort of problematic. Can you tell- was he- was Mr. Chin there at the second hearing when the district court sort of finalizes his sentence and says how much he has to forfeit? Off the top of my head, I actually don't know if Mr. Chin was present for the second forfeiture hearing. The defendant's supposed to be there when he's sentenced, right? That's correct, Your Honor. Here's what I think the district court thought it was doing and did. What the district court did tell Mr. Chin at sentencing is that it was intentionally keeping that judgment open, and by doing that, the district court put Mr. Chin on notice that there was an additional part of his sentence that was still to be determined, and that was the forfeiture order. So regardless of if Mr. Chin was present or not for that second forfeiture hearing, it's clear that at sentencing when we know Mr. Chin was present, he was put on notice by the judge that there was an additional forfeiture issue coming down the pipeline. I think what the district court is doing is trying to abide by the spirit of Rule 32.2, even if not technically the letter. And based on this court's precedent in cases like Martin, what the district court did is not erroneous. This case is actually stronger than the case of Martin, the Fourth Circuit's case in Martin. In that case, the forfeiture order came after the judgment. In this case, the forfeiture order came on the exact day of the judgment, and it seemed like Mr. Chin actually benefited from that additional time that the court had to consider the forfeiture issue because the judge credited many of Mr. Chin's arguments, which reduced that forfeiture amount, from what the government originally requested in this preliminary order of forfeiture. And since this, I think this is a harmlessness review, and not only was it harmless, you're saying he actually benefited from the out-of-order sequence. That's correct, Your Honor. Harmless error review attaches here, and that's correct. I think Mr. Chin absolutely benefited to the tune of about $200,000 from the fact that the district judge here took additional time to consider the arguments, and in doing so, he rejected some of the government's calculations and credited some of Mr. Chin's calculations instead. Okay. I see that my time is almost up. Unless the court has other questions, I will thank the court for its time. All right. Thank you, Mr. Ray. Mr. Greenberg. Three points. I could hit the high notes on this one. The first one is the Dubin issue. Your Honor, I'd like you to consider the fact that the crux of the gift card scheme, there was no identity of any of the gift cards. There was no identity being sought at any one time for any of the hundreds of cards. But what about the debit? I mean, what about the debit card? No, the one debit card clearly was. Okay. But my argument is that that's out of sync with anything else that was going on, that the one transaction was outside the conspiracy. The people that were involved, Tracy, was not part of the conspiracy of the gift cards. He never sold them or deemed them any part of the buying or selling of them. That was a one-off. And that that particular, that the jury should have known that the crux of that, the crux was not to get other people's identities. And that's the very thing that the Dubin court looked at, where somebody was getting identities, but they weren't using it to commit the Medicare fraud. And they said that the identities were not part of the scheme, and therefore that the enhancement should not have been applied because it's a significant enhancement. The same exact thing is happening here. He's getting 24 months because he tried to buy $600 worth of tires using someone else's identity, clearly. So the problem is that's not a federal offense if it's in its own category by itself because it doesn't meet the 1,000 threshold. And this jury wasn't given the proper instruction. And the court does say, this particular court has indicated there could be an exception. And it seems to me if both the government and the defendant thought that this was the proper law and they admit and they sent it in, and neither the court nor did the parties understood that 90 days before this, the Supreme Court changed how you instruct a jury, that would be a very good reason for this court to find an exception in this case. This is the zebra outside of the horses. It's different. And I think I submit to the court that this is a reason to consider it. The other issue is in the forfeiture proceeding, it is my understanding in this particular case that the judge never entered the forfeiture order, as he's required to under 32. He never indicated he was going to give a forfeiture, as you've made exceptions before this court has over the idea that someone said, I'm going to give a forfeiture, I'm telling you it's going to happen. And the court didn't do it timely, but this court found that he was put on proper notice. Here, Judge Austin never said to Mr. Chen, I'm going to enter a forfeiture order. In fact, he found that the calculations by the government was not appropriate and he proceeded to sentencing. He gave him 84 months. He gave him three years of supervised release. He talked about restitution, and then he said to him, I want you to sign something showing you're on notice about your appeal, and I'm now remanding you to the custody of the marshal. And as he stood up to leave, the government stood up and said, John, wait, we'd like to still brief this whole issue of forfeiture. And he said, oh, okay, you can do that. Now, he has announced sentence in a public setting, and from what I've seen in another case I was involved in, that once that happens, the district court is no longer able, no longer has the authority. The Supreme Court says that's a procedural timing order, and when we're going to look at it, we really need to look at the substance of the whole forfeiture business to make sure he has notice and ability to respond. In other words, it's not a jurisdictional issue. It's a procedural timing sequence that's imposed and was violated here. Your Honor, but there are two issues here. There's both the failure to follow Rule 32 and there's the fact that they announced publicly the sentence and he's trying to now open up the sentencing when it's too late. I've had that in a district court, in this very district court, where a judge sentenced my client to a particular set of time. He reconsidered the sentence within three hours, and this court found that that was not allowed, that once he announced sentence, that ended the sentencing transaction. And this court had sentenced Mr. Chen to his time in jail, and it sent him off to the marshal, and then decided they were going to open it up, and even then the judge didn't say, and by the way, I plan to order some forfeiture, because the judge had yet to hear something that he was convinced that they calculated properly that he should have to order the forfeiture. So it's not just the 32 section, Your Honor, that you just mentioned, but it's also the fact of the announcing sentence and whether he's lost jurisdiction at that point to continue forward. The last point I want to say is that, Your Honor, Judge Stacker, Walmart has, you can check out these gift cards at a stand-alone. You don't have to talk to the Walmart employees. They don't mind how many people, they make a lot of money out of people buying and selling gift cards. So you don't have to deceive, there is no deception, because Walmart doesn't stop anybody. They don't ask questions. Gift cards are like finding money in the street to some degree. They don't actually belong to anyone as far as you would know, and when you hand it to Walmart, they don't ask, you don't have to even hand it to Walmart. You go to the machine, you put in the number, and it spits out your credit. So he certainly didn't deceive Walmart members, and he certainly didn't deceive and cheat them. He never took, Walmart never lost a dime. So maybe they could do a lot more to stop this gift card stuff, but quite frankly, if Walmart knew what he was doing when he did it, they would have never provided him with the money. In other words, he was trying to cheat around the system by going quickly and taking advantage of that machine before Walmart could discover it. That was the fraud on Walmart. Your Honor, Walmart didn't testify to that fact. No, that's the facts of the case. It's not a question of whether Walmart testified. It's a question of they got that money out of a machine that they weren't entitled to because they were deceiving the system, and they had lies planned, and they had excuses planned. The timing was planned and very closely calculated, and all of that was in an effort to get the money that they knew was stolen. Now that, to me, is a fraud on the bank, on that little machine that was issuing the money. Your Honor, I see my time has expired. Yeah, okay. You can respond if you wish. Your Honor, I realize, Judge Nieman, I realize that you're not a fan of this particular argument, and I submit to you that Walmart doesn't do anything to stop people from taking gift cards, in particular gift cards, which really is like finding money in the street. If I leave this courthouse right now and I find a Starbucks card at the bottom that someone bought years ago, and if I want to, I can hand it to Starbucks, and they'd be happy to give me, if there's $5 left, they'll give me a cup of coffee. Walmart also puts plants and goods outside the door there for sale, assuming you'll take them in and pay for them. But people do come and take them away, and it seems to me when they come and take them away, they're defrauding Walmart of those plants. Yeah, but Walmart, if they really wanted to stop this, they'd have a lot of ways of doing so. So I don't want to, I'm not disparaging them and trying to say they're trying to foster fraud of any kind or theft. They're not fostering. They are being deceived by Mr. Chen and his program. His program was to lie, to provide an excuse, to do it timely, to do it very quickly, to do it at a machine as opposed to a cash register. They lose no money, Your Honor. They don't lose a dime, not one solitary dime. It doesn't matter that it was, Walmart would not have given them that money. Well, you know, I submit that's speculation because I understand the moral structure. So you're suggesting that you walk up to Walmart and say, I have a stolen credit card. Will you give me the cash? No, I submit that if I walk up to the cash register and I pull out my gift card and I say, I want to buy this off my gift card, they say, thank you very much. They ring up the cell and let me walk out the door. They don't ask me any questions. They're not trying to worry if they're being deceived or not. They just want to know if the gift card is valid and has cash on it. If it has cash on it, they let me go through with the transaction. I walk out the door. And if I don't want to do it with a live person, I can walk over to one of the little kiosks and I can put my gift card in and say, I'd like to have an Apple gift card instead of this Walmart gift card and say, thank you very much, thanks for doing business with us, and they send me out the door. All right. Thank you. We'll come down to Greek Council and proceed on the last case.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Pamela A. Harris